UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Yolanda Wright | ) | Case No. 12-05206-TOM-7 |
| | ) | |
| Debtor. | ) | |

| | | |
|---|---|---|
| Yolanda Wright | ) | |
| | ) | |
| Plaintiff | ) | A.P. No. 13-00025-TOM |
| | ) | |
| vs. | ) | |
| | ) | |
| RBS Citizens Bank | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This adversary proceeding is before the Court following a trial on March 19, 2014 on a complaint to determine the dischargeability of student loan debts filed by the Plaintiff, Yolanda Wright ("Ms. Wright" or "Debtor"). Appearing at the trial were: Ms. Wright and Katherine Luders, attorney for the Defendant, RBS Citizens Bank ("RBS"). The Court has jurisdiction pursuant to 28 U.S.C. §§151, 157(a) and 1334(b) and the United States District Court for the Northern District of Alabama's General Order Of Reference Dated July 16, 1984, As Amended July 17, 1984.[1] This is

---

[1] 28 U.S.C. § 151 provides:

1

a core proceeding as defined in 28 U.S.C. § 157(b)(2)(I).[2] The Court has considered the pleadings, the arguments, the testimony, the evidence admitted and the law and finds and concludes as follows.[3]

## I. FACTUAL BACKGROUND

Ms. Wright worked in the banking business from about 1992 until 2005. She testified that

---

In each judicial district, the bankruptcy judges in regular active service shall constitute a unit of the district court to be known as the bankruptcy court for that district. Each bankruptcy judge, as a judicial officer of the district court, may exercise the authority conferred under this chapter with respect to any action, suit, or proceeding and may preside alone and hold a regular or special session of the court, except as otherwise provided by law or by rule or order of the district court.

28 U.S.C. § 157(a) provides:

Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy judges for the district.

28 U.S.C. § 1334(b) provides:

Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

The General Order of Reference as amended provides:

The general order of reference entered July 16, 1984 is hereby amended to add that there be hereby referred to the Bankruptcy Judges for this district all cases, and matters and proceedings in cases, under the Bankruptcy Act.

[2] 28 U.S.C. § 157(b)(2)(I) provides:
   (b)(2)Core proceedings include, but are not limited to–
      (I) determinations as to the dischargeability of particular debts;

[3] This Memorandum Opinion constitutes findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, applicable to adversary proceedings in bankruptcy pursuant to Federal Rule of Bankruptcy Procedure 7052.

2

she was part of large layoff in 2005 and decided to take the opportunity to return to school and further her education. She began classes at Virginia College and in 2009 received an Associate Degree in Human Resources. She testified that despite her degree she was unable to become employed in the Human Resource field because she lacked experience. So she re-entered Virginia College and in 2011 received a second Associate Degree, this one in the field of Respiratory Therapy. To attend school for both degrees she borrowed money from the United States Department of Education, Sallie Mae and RBS.

On November 2, 2012, the Debtor filed a chapter 7 petition in bankruptcy and thereafter filed this Adversary Proceeding to determine the student loans she owed to be dischargeable pursuant to 11 U.S.C. § 523(a)(8). As of the date of the hearing, she owed the Department of Education approximately $65,000.00 but has entered into an Income Contingent Repayment Plan which determines her payment obligation based on her income. Since she is currently not working, she has no obligation to make payments on that loan and she said until her income exceeds $20,000.00 per year, she does not believe she will have any payment obligation. She owed approximately $28,000.00 to Sallie Mae but as a result of this Adversary Proceeding, Sallie Mae has agreed its debt will be discharged by the Debtor's Bankruptcy Case. The Debtor's remaining student loan was originally with Charter One Bank. The Note for $20,000.00, dated December 27, 2007, is now owned by RBS and the current balance is $30,892.20. As a result of her agreements with the Department of Education and Sallie Mae, the trial and this Opinion relate only to the remaining Defendant, RBS.

After the Debtor was laid off from the Bank, she apparently became the primary caregiver for her ill son for a number of years while she attended school. She testified that she was able to

3

Case 13-00025-TOM    Doc 48    Filed 04/02/14    Entered 04/02/14 12:33:11    Desc Main
Document      Page 3 of 15

attend school but not able to work while caring for him. In 2010, the Debtor and her husband were divorced and in 2011 the Debtor's father passed away. In late 2012, the Debtor's son was ultimately placed in a facility that provided care for him but he passed away in January 2013. Since the first part of 2013, the Debtor testified that she has been looking for full time employment but so far has only had one job and it only lasted five months. She also explained that she was able to draw unemployment compensation for about four months starting the latter part of 2013 after she lost the job.

On cross examination, Debtor testified that she thinks she discharged approximately $10,000.00 - $15,000.00 of non student loan debt as a result of this bankruptcy. She also explained that she has been receiving child support from her ex-husband since the divorce and that she continues to receive that income for her daughter. She also received a total of $24,000.00 in alimony, $1,000.00 per month for twenty four months but that ended over a year ago. She had to move out of the house she was awarded in the divorce because she could not afford the notes of $1,500.00 per month. The mortgage company foreclosed its loan as a result of the payment default. The Debtor surrendered her 2004 Mustang to the secured creditor that financed it because she was unable to make payments. She testified that she drives a vehicle that her ex-husband provides her. She disclosed upon further questioning that this vehicle is a fairly new vehicle, a 2012 VW Jetta. Also, upon being questioned by RBS's counsel she acknowledged that some of her schedules were inaccurate and claimed it was based in part because of her understanding of the forms: her income from the short term job was not reflected, her alimony was not shown as income on the Means Test nor did she provide any information regarding her small side business cleaning houses. She receives $75.00 for cleaning a house and she thinks she may have earned $10,000.00 for 2012.

4

The Debtor provided emails and other documents reflecting that she has applied for several jobs in the last few months. She has not, however, attempted to locate any part time job because she insists she needs full time work and benefits. The Debtor is not disabled nor unable to work due to any medical conditions. The parties submitted to this Court a joint stipulation whereby the parties agreed that the loan to RBS was made, the balance is $30,892.20, the loan was made for Debtor to attend college and the loan is the type described in 11USC § 523(a)(8).

## II.    CONCLUSIONS OF LAW

Congress' main purpose in enacting the Bankruptcy Code was to ensure the insolvent debtor a fresh start by discharging his prepetition debts. *Grogan v. Garner*, 498 U.S. 279, 286 (1991) (*citing Local Loan Co. v. Hunt*, 292 U.S. 234 (1934)). In furtherance of Congress' fresh start policy, the Eleventh Circuit has generally construed exceptions to discharge narrowly. *Equitable Bank v. Miller (In re Miller)*, 39 F.3d 301, 304 (11th Cir. 1994). However, 11 U.S.C. § 523(a)(8) specifically provides that only in certain circumstances will education loans extended by or with the aid of a governmental unit or nonprofit institution solely on the basis of the student's future earnings potential be discharged in bankruptcy.[4] Several reasons have been cited to explain why Congress

---

[4] 11 U.S.C. § 523(a)(8) provides:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt -
  (8) unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for--
    (A)(i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or
      (ii) an obligation to repay funds received as an

5

excepted student loans from a discharge in bankruptcy. One source claims that it was in response to "the perceived need to rescue the student loan program from insolvency, and to also prevent abuse of the bankruptcy system by students who finance their higher education through the use of government backed loans, but then file bankruptcy petitions immediately upon graduation even though they may have or will soon obtain well-paying jobs, have few other debts, and have no real extenuating circumstances to justify discharging their educational debt." *Green v. Sallie Mae (In re Green)*, 238 B.R. 727, 732-33 (Bankr. N.D. Ohio 1999) (*citing* "Report of the Commission on the Bankruptcy Laws of the United States," H.R. DOC. NO. 93-137, 93d Cong., 1st Sess., Pt. II 140, n.14). Another source claims that Congress enacted 11 U.S.C. § 523(a)(8) to ensure that these kinds of loans could not be discharged by recent graduates who would then pocket all future benefits derived from their education. *Andrews Univ. v. Merchant (In re Merchant)*, 958 F.2d 738 (6th Cir. 1992) (*citing* H.R. REP. NO. 95-595, 95th Cong., 1st Sess. 466-75 reprinted in 1978 U.S.C.C.A.N. 5787).

However, notwithstanding these policy concerns, Congress also realized that not all student debtors abused the bankruptcy system, and that some student debtors were truly in need of bankruptcy relief. Thus, Congress determined that an absolute bar to the dischargeability of student loan debts would be too harsh and also unnecessary to effectuate the foregoing policy goals. Consequently, unlike other types of debt, such as alimony and child support for which a debtor cannot receive a bankruptcy discharge, Congress permitted student loan debts to be discharged if the

---

educational benefit, scholarship, or stipend; or
(B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual[.]

debtor could demonstrate extenuating circumstances.

A student loan is not dischargeable "unless excepting such debt from discharge ... will impose an undue hardship on the debtor and the debtor's dependants. . . . " 11 U.S.C.§ 523(a)(8). The creditor bears the initial burden of both proving that a debt is owed and such debt is the type contemplated by § 523(a)(8). *Roe v. The Law Unit, et al. (In re Roe)*, 226 B.R. 258, 268 (Bankr. N.D. Ala. 1998). Once proven, the burden shifts to the debtor to show that repayment of the debt would cause an undue hardship. *Id*. The appropriate standard of proof for § 523(a)(8) is a preponderance of the evidence. *Grogan v. Garner*, 498 U. S. 279, 290 (1991).

### A. The Debt

Ms. Wright acknowledges in the joint stipulation filed in this matter that she owes the debt to RBS and that her loan from RBS is the type contemplated by § 523(a)(8). Therefore, the burden at trial was shifted to Ms. Wright to prove that repayment of the debt would be an undue hardship on her and her dependents.

### B. Undue Hardship

The Eleventh Circuit Court of Appeals adopted the three part test for proving "undue hardship" that was first articulated by the Second Circuit in *Brunner v. New York State Higher Education Services Corp*, 831 F.2d 395 (2d Cir. 1987). *Hemar Ins. Corp. of Am. v. Cox (In re Cox)*, 338 F.3d 1238 (11th Cir. 2003). Quoting *Brunner*, the Eleventh Circuit noted that

> [to establish "undue hardship," the debtor must show] (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

7

Case 13-00025-TOM    Doc 48    Filed 04/02/14    Entered 04/02/14 12:33:11    Desc Main
Document    Page 7 of 15

*Cox*, 338 F.3d at 1241. This Court will address each of the three factors to apply the *Brunner* test to determine if the Debtor's student loan debt to RBS is dischargeable. For the Debtor to discharge this debt she must prove all three elements of the *Brunner* test.

### 1. First *Brunner* Factor

The first *Brunner* factor requires Ms. Wright to prove that based on her current income and expenses she cannot maintain a "minimal" standard of living for herself and her children if she is forced to repay the student loan. Courts have taken differing views about what constitutes a "minimal" standard of living. Few courts still use the United States Department of Health and Human Services Poverty Guidelines as a "bright line" determination of the minimal standard of living for student loan dischargeability purposes.[5] The Court does not believe that, in most cases, a debtor and his family living at or slightly above the federally defined poverty line is maintaining a "minimal" standard of living. Therefore, this Court rejects the notion that a debtor must fall below the federal poverty line to discharge a student loan.

This Court believes that a more thoughtful, analytical approach should be taken. A minimal standard of living lies somewhere between "poverty and mere difficulty." *McLaney v. Kentucky Higher Educ. Assistance Authority (In re McLaney)*, 314 B.R. 228, 234 (Bankr. M.D. Ala. 2004). The court must examine the debtor's living situation to ensure that the debtor has no unnecessary and frivolous expenses; however, the debtor should not be forced to live in abject poverty with no

---

[5] These guidelines define eligibility for certain government benefits and programs and are designed to assist the needy and economically disadvantaged. According to the 2014 Health and Human Services Poverty Guideline, the poverty level for a family of two is $15,730 per year. *Federal Register*, Vol. 79, No. 14, January 22, 2014, pp. 3593 - 94, *available at* https://www.federalregister.gov/articles/2014/01/22/2014-01303/annual-update-of-the-hhs-poverty-guidelines (last visited April 1, 2014).

8

comforts. Judge Benjamin Cohen best described a minimal standard of living as "a measure of comfort, supported by a level of income, sufficient to pay the costs of specific items recognized by both subjective and objective criteria as basic necessities." *Ivory v. United States Dep't of Educ. (In re Ivory)*, 269 B.R. 890, 899 (Bankr. N.D. Ala. 2001). Judge Cohen went on to list numerous basic necessities needed to maintain a minimal standard of living:

> 1. People need shelter, shelter that must be furnished, maintained, kept clean, and free of pests. In most climates it also must be heated and cooled.
> 2. People need basic utilities such as electricity, water, and natural gas. People need to operate electrical lights, to cook, and to refrigerate. People need water for drinking, bathing, washing, cooking, and sewer. They need telephones to communicate.
> 3. People need food and personal hygiene products. They need decent clothing and footwear and the ability to clean those items when those items are dirty. They need the ability to replace them when they are worn.
> 4. People need vehicles to go to work, to go to stores, and to go to doctors. They must have insurance for and the ability to buy tags for those vehicles. They must pay for gasoline. They must have the ability to pay for routine maintenance such as oil changes and tire replacements and they must be able to pay for unexpected repairs.
> 5. People must have health insurance or have the ability to pay for medical and dental expenses when they arise. People must have at least small amounts of life insurance or other financial savings for burials and other final expenses.
> 6. People must have the ability to pay for some small diversion or source of recreation, even if it is just watching television or keeping a pet.

*Id*. *Brunner* requires that this determination be based on the debtor's current income and expenses; thus the Court must look at the debtor's income and expenses at the time of trial. *See Cox*, 338 F.3d at 1241.

Ms. Wright's monthly income at the time of trial was about $1,200.00. In addition, she receives food stamps but did not testify as to the dollar amount. Also, although not reflected in her schedules, if she works in her side business and earns about $10,000 per year, she has additional income of about $800.00 per month. Her expenses according to her schedules include rent, utilities and food and total about $1,400.00. The Court does not believe that Ms. Wright's expenses are

9

Case 13-00025-TOM    Doc 48    Filed 04/02/14    Entered 04/02/14 12:33:11    Desc Main
Document      Page 9 of 15

abnormally high and will not pick apart her schedules and testimony trying to squeeze every last penny from her. To the contrary, the Court believes that she may have underestimated some necessary expenses and entirely omitted others. For example, she scheduled $200.00 per month for food. That amount strikes the Court as unrealistically low given that she has a daughter to feed (though this may be the amount she estimates over and above her food stamps, which may be a realistic amount). Further, she did not schedule anything for medical or dental expenses or for transportation, i.e., gasoline for the vehicle she uses, though her ex-husband may provide that for her in addition to the use of the vehicle. Additionally, no money was scheduled for entertainment. As Judge Cohen stated in *Ivory*, "[p]eople must have the ability to pay for some small diversion or source of recreation, even if it is just watching television or keeping a pet." *Ivory*, 269 B.R. at 899.

Based on the foregoing, the Court believes that Ms. Wright could not maintain a "minimal" standard of living for herself and her dependants if forced to repay her RBS student loan at this time. Therefore, Ms. Wright has successfully proven to the Court that she meets the first factor of the *Brunner* test.

### 2. Second *Brunner* Factor

The second *Brunner* factor requires the debtor to show additional circumstances indicating that her state of affairs (that is, the inability to maintain a minimal standard of living if forced to repay the student loans) is "likely to persist for a significant portion of the repayment period." *Brunner*, 831 F.2d at 396. These circumstances must demonstrate a "certainty of hopelessness, not simply a present inability to fulfill financial commitment." *Nys v. Educ. Credit Mgmt. Corp. (In re Nys)*, 308 B.R. 436, 443 (B.A.P. 9th Cir. 2004). *See also Cox*, 338 F.3d at 1242. While there is no definitive list of what are considered "additional circumstances," they may include:

10

1. Serious mental or physical disability of the debtor or the debtor's dependents which prevents employment or advancement;
2. The debtor's obligations to care for dependents;
3. Lack of, or severely limited education;
4. Poor quality of education;
5. Lack of usable or marketable job skills;
6. Underemployment;
7. Maximized income potential in the chosen educational field, and no other more lucrative job skills;
8. Limited number of years remaining in work life to allow payment of the loan;
9. Age or other factors that prevent retraining or relocation as a means for payment of the loan;
10. Lack of assets, whether or not exempt, which could be used to pay the loan;
11. Potentially increasing expenses that outweigh any potential appreciation in the value of the debtor's assets and/or likely increases in the debtor's income;
12. Lack of better financial options elsewhere.

*In re Nys*, 308 at 446-47 (internal citations omitted).

Ms. Wright is a well-groomed, very articulate, and healthy woman. She suffers no major medical conditions that are likely to affect her ability to hold a steady job, nor does her daughter suffer from major medical problems that require specialized care. Although the Debtor suffers from hypertension it does not prevent her from being able-bodied and fully able to work.

Other factors also suggest that her current financial condition is likely to improve in time. The Debtor holds two Associate Degrees, one in Human Resources and one on Respiratory Therapy, and she has substantial and varied experience in the banking field. The Court acknowledges that banking may not be a career path that Ms. Wright wants to pursue as a result of her lay off several years ago, but she cannot ignore what may be a viable path to paid employment. A bad memory does not equate to a "certainty of hopelessness" that would allow her to discharge her loan based on undue hardship. As for the two degrees she obtained, despite the fact that thus far she has not gained employment in either field, she is "not entitled to an undue-hardship discharge by virtue of selecting

11

an education that failed to return economic rewards." *Coveney v. Costep Servicing Agent, et al. (In re Coveney)*, 192 B.R. 140, 143 (Bankr. W.D. Tex. 1996) (*citing Matter of Roberson*, 999 F.2d 1132, 1137 (7th Cir. 1993)).

The Court believes Ms. Wright has the ability to gain employment, whether it be full time with one employer in one of her degreed fields or in banking, or perhaps part-time work in addition to her side business. Under either circumstance, Ms. Wright's financial condition is likely to improve. Because Ms. Wright has demonstrated no "additional, exceptional circumstances" that suggest her current inability to repay will continue for a substantial portion of the repayment period she has failed to meet the second element of the *Brunner* test.

Despite Ms. Wright's failure to prove the second *Brunner* factor, and thus to prove undue hardship under § 523(a)(8), the Court will still discuss the third *Brunner* factor as it relates to this case.

### 3. Third *Brunner* Factor

The third *Brunner* factor requires showing that the debtor made a good faith effort to repay the RBS student loan. *Brunner*, 831 F.2d at 396. What is considered a debtor's good faith effort varies widely among courts; however, courts are generally reluctant to find good faith where a debtor made minimal or no payments on his or her student loans. *See, e.g., Murphy v. CEO/Manager, Sallie Mae, et al. (In re Murphy)*, 305 B.R. 780 (Bankr. E.D. Va. 2004) (no good faith where the debtor made no payments on her student loans); *Garrett v. New Hampshire Higher Educ. Assistance Found., et al. (In re Garrett)*, 180 B.R. 358, 364 (Bankr. D.N.H. 1995) (no good faith shown where "[t]he record is devoid of any payment made by [the debtor] on these loans or even any attempt to enter into a repayment schedule with [the lenders]"). Other factors to consider

12

include the amount of the student loan debt as a percentage of the debtor's total indebtedness and whether the debtor attempted to find employment. *See, e.g., Murphy*, 305 B.R. at 798-99 *(citing Hall v. U.S. Dep't of Educ. (In re Hall)*, 293 B.R. 731, 737 (Bankr. N.D. Ohio 2002)).

Some courts also consider whether the debtor attempted to negotiate a repayment plan, or explored various repayment options such as the standard repayment plan, extended repayment plan, graduated repayment plan and income contingent repayment plan. *See, e.g., Educ. Credit Mgmt. Corp. v. Mason (In re Mason)*, 464 F.3d 878, 884-85 (9th Cir. 2006); *Cota v. U. S. Dept. of Educ. (In re Cota)*, 298 B.R. 408, 414 n.7, 420 (Bankr. D. Ariz. 2003). A debtor's failure to take advantage of those repayment options is not per se indicative of bad faith, however. *Cota*, 298 B.R. at 420. The U.S. Department of Education's repayment plans may not be used as a sword to prevent dischargeability of student loans if the debtor chooses not to participate in them.

Since graduating from Virginia College, Ms. Wright has made no payments towards her student loan. While this alone may not indicate a lack of good faith, given the totality of the circumstances the Court believes that Ms. Wright has not demonstrated a good faith effort to repay this loan. According to Ms. Wright's testimony she received alimony for two years, worked for five months, then drew unemployment benefits for four months. She has a side business cleaning houses, which she testified may have brought in $10,000.00 in 2012. Given that Ms. Wright is able-bodied and holds two degrees, and yet has not looked for any job other than full-time employment with benefits, the Court believes she has not maximized her ability to find employment so she could repay her student loan. Further, as a result of this adversary proceeding Ms. Wright has taken advantage of entering into an income contingent repayment plan for her Department of Education loans and has discharged her Sallie Mae loans, so the only remaining student loan is the RBS loan. Finally, Ms.

13

Wright acknowledges having unsecured student loan debts totaling approximately $120,000.00 at the time her case was filed. Thus, these student loans account for about three-fourths of the total debt she seeks to have discharged in her Chapter 7 bankruptcy.

In this case, as noted in closing arguments by Counsel for RBS, Ms. Wright has certainly suffered some tragic and difficult times including her divorce, the loss of her father and the especially sad loss of her ill son. Yet those times are in her past and she does not anticipate similar issues in the future. Also, the Court must consider that Ms. Wright has not made any effort thus far to repay anything on this student loan. Therefore, Ms. Wright has not proven to the Court that she made a good faith effort to repay her student loan and therefore has not proven the third factor under the *Brunner* test.

Based on the *Brunner* standard, Ms. Wright has not proven that she will suffer an undue hardship if forced to repay this RBS student loan. Therefore, the Court finds that Ms. Wright's student loan to RBS is not dischargeable under 11 U.S.C. §523(a)(8).

### III. CONCLUSION

A finding of undue hardship should be limited to only exceptional cases. This is not such a case. Ms. Wright has explained the difficult times and tragic events that have occurred in her life over the last few years; however, she has not shown any evidence that the difficult times will persist into the future. Thus, Ms. Wright has not proven undue hardship under the *Brunner* test and is therefore not entitled to a discharge of her RBS student loan under 11 U.S.C. §523(a)(8). Accordingly, it is hereby

**ORDERED, ADJUDGED, AND DECREED** that the relief sought by the Debtor, Yolanda Wright, to declare her student loan debt due and owing to RBS dischargeable pursuant to 11 U.S.C.

§ 523(a)(8) is **DENIED**. Accordingly, the balance of Ms. Wright's debt owed to Defendant, RBS Citizens Bank, is hereby declared to be **NONDISCHARGEABLE**.

Dated: April 2, 2014

/s/ Tamara O. Mitchell
TAMARA O. MITCHELL
United States Bankruptcy Judge

xc: Yolanda Wright, Debtor
Katherine Luders, Attorney for RBS Citizens, N.A.
James G. Henderson, Trustee

15